THE PEOPLE OF PUERTO RICO, Plaintiff, *v.* JUAN VALLDEJULI, Defendant.

No. 8. Argued July 10, 1941.—Decided July 29, 1941.

331

Defendant adjudged guilty of contempt and sentenced accordingly.

*R. A. Gómez, Prosecuting Attorney* and *Luis Negrón Fernández,. Assistant Prosecuting Attorney* for plaintiff. *R. Cuevas Zequeira* and *Román Díaz Collazo* for defendant.

Mr. Justice Travieso delivered the opinion of the court.

The facts that gave rise to the filing of the complaint for contempt against Attorney Juan Valldejuli-Rodríguez are as follows:

The hearing of the certiorari proceeding brought by Dr. Carlos M. de Castro against the Board of Commissioners of the Government of the Capital, to review an order of said board removing him from the office of City Manager of San Juan, was held before the Supreme Court on January 17, 1940. The board was represented by the respondent.

On the morning following the day of the hearing, respondent appeared in person before Mr. Justice De Jesús, of this court, in his office in the Capitol Building where the Supreme Court of Puerto Rico is located, at a time when said judge was there in the discharge of his duties, and stated to him: That in the afternoon of the previous day, as he was

leaving the marshal's office after the close of the hearing of said certiorari proceeding, and while respondent was walking through the rotunda of the Capitol, a person half-hidden behind one of the columns pointed at him with a revolver and ran away when respondent drew his gun; that he could not recognize said person but noticed that his assailant wore amber-colored eyeglasses; that that same afternoon a friend of his informed respondent that he had seen the person who had pointed the revolver at respondent, at a café table, at Stop 15 in Santurce, accompanied by Dr. De Castro and his wife, who had both attended the hearing of the case.

After listening to respondent's report, Mr. Justice De Jesús inquired whether he wished that the matter be brought to the attention of the court and respondent replied: ''As you wish.'' Considering that Mr. Valldejuli-Rodríguez had come to see him for that purpose and interpreting his wish to be that the matter be submitted by him to the consideration of the court, that same afternoon, while the judges were in the Conference Room with the object of discussing and deciding the cases already submitted, Mr. Justice De Jesús notified the court of what respondent had informed him, in order that the court might take whatever measures it might deem proper and just.

Considering that respondent is an attorney in practice of his profession and as such an officer of this court, whom the court is obliged to protect from any aggression or other act of violence that might be attempted or committed against his person by reason of words spoken or acts carried out in the defense of a case pending before this court, the latter thought that the facts reported by Mr. Valldejuli-Rodríguez to Mr. Justice De Jesús and by request of the former submitted to the court, were of such a serious nature, that if true might constitute a contempt of court in conformity with the opinion in *In re Castro*, 52 P.R.R. 133, where this same respondent was assaulted under circumstances very similar to those

described by him in his report to Mr. Justice De Jesús; and in compliance with its duty of protecting an officer who alleged to have been the object of an assault and for the sake of its own prestige and dignity, the court assumed jurisdiction over the facts complained of by respondent and ordered that a preliminary investigation be made with the object of punishing for contempt the perpetrator of the alleged assault and all persons who might be guilty of complicity therein.

As a result of the investigation made the court doubted that the facts complained of by Mr. Valldejuli-Rodríguez were true and was led to believe that his statements might have been made with the object of unduly influencing the court against the adverse party in said certiorari proceeding. On January 24, 1940, the court referred the matter to the prosecuting attorney, with instructions to make a full investigation of the facts and to submit the result of the same, with his recommendations, to the court.

On July 13, 1940, the Prosecuting Attorney of this Supreme Court, complying with the order entered by us on the first of said month, filed a complaint wherein after stating the facts already mentioned, the following specific charges are made against respondent:

"*Fifth:* That the facts stated in the morning of January 18, 1940, by respondent Juan Valldejuli-Rodríguez to the Hon. A. R. de Jesús, as happened to said attorney in the afternoon of the previous day and at the place specified by him in his statements to said Justice as alleged in the second paragraph of this complaint, were false, the said respondent knowing then and there their falsity, inasmuch as the said Attorney Juan Valldejuli-Rodríguez, once the hearing of case No. 8070 mentioned in the first paragraph preceding, had terminated, left the Capitol Building where the Supreme Court is located accompanied by Mr. Rafael Cestero, he having gone first from the courtroom to the office of the marshal and from the latter place to the exit of the building, without anything happening between Mr. Valldejuli-Rodríguez and any other person while the former was leaving and without any other person interfering with

him, threatening him or pointing any weapon at him, in the route followed by him in leaving this Hon. Court, and without the said attorney drawing his revolver at any time.

"*Sixth:* That when respondent Juan Valldejuli-Rodríguez reported to the Hon. A. R. de Jesús the facts stated in the second paragraph of this complaint as if the same had happened to respondent, with the request that the same be transmitted by said magistrate to this Hon. Court, he did so unlawfully and wilfully, and knowing that said facts were false and that he was stating them with the object of tending to unduly influence the Justices of this Hon. Court against the adverse party in the aforesaid suit, that is against appellant Dr. C. M. de Castro."

On July 10, 1941, we overruled respondent's motion to dismiss the proceeding (*ante,* p. 117) because we concluded that "the complaint states facts that, in our opinion, if proved, would be sufficient to constitute contempt." The hearing of the case was held on said date. The prosecuting attorney, after offering in evidence the journal entry of the hearing held on January 17, 1940, in case No. 8070, certiorari, and the judgment rendered in the same proceeding on June 28, 1940, offered the testimony of several witnesses, who in short testified as follows:

Angel R. de Jesús, Associate Justice of the Supreme Court, after repeating the report received by him from Mr. Valldejuli-Rodríguez regarding the alleged assault, substantially as already stated by us, went on to testify: That respondent did not specify the capacity in which the statements were made to him; that witness understood that said statements were made to him as a judge, and that respondent came to his office for that sole purpose. That witness, as a private person, could have done nothing and that was why witness informed respondent that as the Supreme Court was composed of several judges defendant should see the Chief Justice; that when witness asked respondent whether he wanted the witness to notify the court of the matter, respondent answered "As you wish." That as respondent had come to his office expressly for that purpose, witness inter-

preted his intention to be that the court be informed and that was why he did so, because a case which concerned the court was involved, for any one who did that should be punished, and that was why he thought it advisable that the case be presented to the court. To questions put to him by counsel, he answered: That he has known respondent for many years, and has always had with him the same as with any other attorney cordial relations; that the interest he took in the matter was not in order to find out whether the incident was true or not. The interest he thought the court might have was that the facts complained of by Mr. Valldejuli-Rodríguez be investigated and the guilty party punished, "because I understand that an attorney who practices his profession and is assaulted on leaving the court ought to be protected by the latter." That he would have acted as he did had any other lawyer been involved; that the relation existing between the facts denounced by Mr. Valldejuli-Rodríguez and the case heard before the court the previous day was that as mention had been made in the course of the argument of the Municipal Auditor, Mr. Ramírez Nadal, who preferred the charges against Dr. De Castro, witness believed that the intention of Mr. Valldejuli-Rodríguez was that the person guilty of the assault against him be punished. That witness accepted everything as true. That when the facts were communicated to the court it was of opinion that that might influence the mind of the court in the decision of the case, against Dr. De Castro, for according to Valldejuli-Rodríguez' report the man had been seen drinking at a café with Dr. and Mrs. De Castro; that that was the connection of cause and effect the court saw in the matter, and it understood that if what respondent had said was not true his act would amount to a contempt, and ordered the prosecuting attorney to make a more ample investigation.

William G. Látimer, Marshal of the Supreme Court, testified: That he was in the courtroom during the hearing of

the case against Dr. De Castro and the Board of Commissioners, and among the persons he saw there he remembers Dr. De Castro, his wife, Attorney Tirado Géigel, a watchman of the Capitol, surnamed Christian, and two or three other persons he could not identify; that when the hearing ended he went towards his office through the door leading to the rotunda, walked through the corridor next to the elevator and crossed the said rotunda; that while he was there he saw the watchman Christian walking in a southern direction, that is, towards the vestibule leading to Ponce de León Avenue; that witness went to his office to see whether the attorneys for Dr. De Castro were there, in order to inform the latter, and after informing Dr. De Castro that the said attorneys had gone, witness returned to his office; that he saw respondent before, during and after the hearing; that when Mr. Valldejuli-Rodríguez arrived he was accompanied by Mr. Cestero and after the hearing witness saw him enter the secretary's office; that witness saw him again when Valldejuli-Rodríguez returned to the marshal's office where Valldejuli-Rodríguez remained a few minutes and from there he left with Mr. Cestero towards the corridor next to the secretary's office; that he did not see Mr. Valldejuli-Rodríguez until the following day at 11 A. M., when respondent came to his office to inform witness of what happened the day before and to request witness to come with him to the place where the facts mentioned by him had occurred; that respondent took witness to the front part of the columns next to the southern vestibule; that respondent informed him of the case as follows: That as respondent left he (respondent) went down the stairs of the corridor next to the secretary's office; kept on walking and in the first opening between the columns next to the southern vestibule, as he turned, Mr. Cestero shouted "watch out" or "look" and as respondent turned his face he saw a protruding arm and part of a face with amber-colored glasses; that thereupon respondent remembered that

he was carrying a weapon, drew his revolver, and his books fell down; that as he drew the gun the arm of the person hiding behind the column disappeared and respondent was not able to see his assailant; that when Mr. Valldejuli-Rodríguez finished his report witness asked him "what do you want to do?" and respondent answered "I have come to see any one of the judges"; witness inquired "the Chief Justice or any one of the other judges?" and respondent replied "any one, whoever is not busy, any one who can see me." That as Mr. Justice De Jesús was the only one who was in a position to receive respondent, witness took him to the office of said justice; that witness saw Mr. Valldejuli-Rodríguez half an hour later and was present when respondent reported the same set of facts to Assistant Secretary Marrero and to Stenographer Vallecillo and the only thing that respondent added with regard to the alleged assailant was "I think that if I saw that man I could identify him."

Attorney Borinquen Marrero, Assistant Secretary of the Supreme Court, testified: That he acted as secretary during the hearing of the certiorari proceeding and remembered having seen the following persons in the courtroom: Dr. De Castro and a lady whom he learned later was Mrs. De Castro, Attorney Tirado-Géigel, Mr. Cestero, Mr. Marcos-Morales and to his right Mr. Christian, watchman of the Capitol. After reciting what Valldejuli-Rodríguez had informed him, which was substantially the same account given by Marshal Látimer, the witness went on to testify: That Mr. Valldejuli-Rodríguez did not say why they attempted to assault him but informed witness that he had learned that the previous afternoon Dr. De Castro, Mrs. De Castro, and a man were drinking at a café in Santurce. That Valldejuli-Rodríguez also said that he had seen the person who ran away and that said person was tall, rather thin, had a dark complexion and wore dark eyeglasses.

Jesús Avilés-Román, assistant porter of the Supreme Court, stated: That on the day of the hearing of Dr. De Castro's case he saw Attorney Valldejuli-Rodríguez at about 1:30 or 2:00 P. M., when respondent arrived accompanied by Mr. Cestero. Witness saw him again after the hearing, as Mr. Valldejuli-Rodríguez left the secretary's office towards the street through the long corridor. Deponent was sitting on the bench next to the iron gate from where customarily he answers the office bells. While there he saw Mr. Valldejuli-Rodríguez go out with Mr. Cestero, through the same corridor next to the secretary's office, on the southern side of the Capitol, and which leads to Ponce de León Avenue; that nothing unusual happened while said two gentlemen were leaving; that witness did not see anything happen; that the two men went out together, crossed the door leading to the avenue walking normally. Witness saw no one running and saw nothing extraordinary. That he did not remember having heard any noise, or anything falling, or shrieks. Witness is acquainted with Juan Christian and saw him around.

Juan Christian testified: That at the time of the occurrence he was employed by the House of Representatives as watchman; that he was present at the hearing of the case of the Municipality of San Juan because he used to come down every afternoon to attend the hearings of the Supreme Court as spectator; and remained in the courtroom until the hearing was over. That after the close of the hearing witness saw Mr. Valldejuli-Rodríguez leave the secretary's office. Deponent was at the second door facing the exit leading to Ponce de León Avenue, and from there he saw Mr. Valldejuli-Rodríguez and other persons leave the secretary's office with some papers; that Mr. Valldejuli-Rodríguez came down the stairs of the secretary's office, crossed the first door towards the exit of the Capitol; "I saw him from the moment he went down the stairs until he left the Capitol

Building''; that witness did not see anything happen in that route or anything to call his attention; that there were at the time some people at the rotunda and a court employee sitting on a bench, inside the secretary's office; that during all the time he saw Valldejuli-Rodríguez and his companion, he saw them in a peaceful attitude, until they went downstairs and left, talking, through the second door leading to Ponce de León Avenue; that they did not stop anywhere and nothing extraordinary happened; that witness saw them from the time they left the secretary's office until they left the building; that he knew by sight a court messenger who that afternoon was sitting at the entrance of the corridor leading to the secretary's office, and identifies Jesús Avilés-Román as the messenger to whom he referred. On cross-examination, witness stated that his duty was to watch the building; that he was in the habit of coming down to the courtroom to hear the cases as he is fond of judicial debates; that that day when the hearing ended at 4:30 p.m. he went to the rotunda to see the people go out; that he does not know whether anyone pointed anything at Mr. Valldejuli-Rodríguez but he saw nothing and nothing happened "for I observed him until he went out.''

Attorney Gabriel de la Haba, who represented Dr. De Castro in the case, testified: That as soon as the hearing was over he left the court accompanied by Attorney Rivera-Zayas and went to his office; that he did not see Mr. Valldejuli-Rodríguez again until the following day, when the latter came to his office, manifestly excited and informed the witness that he had come to see witness because something very serious had happened to him. the day before in the court.

Recounting the story which Mr. Valldejuli-Rodríguez told him and which we already know, witness further testified that respondent stated to the witness that he came to inform him of that because as witness was the attorney for Dr. De.

Castro, "who was seen drinking with a person wearing eyeglasses in Santurce" he came to beg of him to talk to Dr. De Castro in order that the latter should keep quiet, as respondent had several children, was a law-abiding citizen, and did not wish to be compelled to use drastic means in self-defense. That witness promised respondent that he would speak to Dr. De Castro and that he would know what to do in case what respondent told him was true.

Attorney Rafael Rivera-Zayas, who also represented Dr. De Castro, merely testified that when the hearing of the case was over, he left the court accompanied by Attorney De la Haba; that he knew Jesús Avilés-Román, a messenger of the Supreme Court, who was standing near the iron-grated door of the corridor of the secretary's office when the witness left the court.

Dr. Carlos M. de Castro, after explaining in detail what he did in the morning of January 17, 1940, testified that on that day, at about 2:10 p.m., he reached the Supreme Court when the hearing of his case against the Board of Commissioners of San Juan had already begun. That when the hearing was over he left the courtroom with his wife and Mr. José Marcos-Morales, but was not sure whether Attorney Tirado-Géigel was with them also; that they went in his car to San Juan where they met Mr. Rafael Rivera-Santiago, who invited them to take a soft drink, after having left his wife with Mrs. Tirado Géigel in the office of the latter's husband; that one and a half hours later they returned to Santurce where attorney Tirado-Géigel, José Marcos-Morales, Rafael Rivera-Santiago, and the deponent met. That from there they went back to attorney Tirado-Géigel's office for their respective wives and then they went to Tirado-Géigel's home in Isla Verde. Mr. and Mrs. Tirado-Géigel stayed there and deponent and his wife returned to their home.

The oral evidence introduced by respondent was as follows:

Attorney Hernán Franco, former District Attorney of San Juan, testified that late in the year 1939 an American gentleman surnamed Irizarry was mortally wounded in Pier No. 1 of the Porto Rico Line. That this man later died in the Municipal Hospital and Enrique Valldejuli, a nephew of Mr. Valldejuli-Rodríguez, was charged with his death. That while deponent was in the hospital an unknown individual came to him saying that his name was Irizarry and that he was a brother of the victim; that said man spoke in violent terms and said that if his brother died he would take the law in his own hands, referring specifically to the Valldejulis; that deponent advised him that a crime was not cured with another crime; that that was why we had courts of justice; that shortly thereafter, after an information had been filed for the death of the victim and while the case was set for trial, the brother of the deceased called again on deponent, in his office, and reiterated what he had formerly said, stating that if Valldejuli was acquitted he would take the law in his own hands; that said man was greatly excited, as if he were desperate; that in a conversation deponent had later with Mr. Valldejuli-Rodríguez, witness informed him of those facts; that the man, Irizarry, was short, bald-headed, had a long nose, and witness does not remember whether his eyes were light or dark, and that the man looked like a jew and was between 5' 6" or 5' 8" tall.

Attorney Benigno Fernández-García, former Attorney General of Puerto Rico, testified that he has known respondent for many years; that when deponent was Attorney General and the office of District Attorney became vacant, Governor Winship and the witness agreed to offer the vacant position to Mr. Valldejuli-Rodríguez, who refused to accept the same because his private interests and his clientele prevented him from abandoning his law office.

Attorney Fernando J. Géigel, who at the time of the hearing was City Manager of San Juan, testified: That on the

day of the hearing of the certiorari proceeding, at about five o'clock in the afternoon, he was in his office; that at that hour, more or less, Mr. Valldejuli-Rodríguez came to his office very nervous and excited, he was hardly able to talk, being quite shocked and somewhat shaky. That deponent asked him "What is the matter with you?" and respondent replied: "Just look at what happened to me, look at the risk one takes in the practice of his profession. He endangers his life." Witness repeated what Valldejuli-Rodríguez stated to him, substantially as told by other witnesses. Asked by the prosecuting attorney whether respondent had indicated to him anything that might tend to explain the cause of the assault, witness replied: "It seemed to me, of course, that his impression at the moment was that everything was due to the case just heard."

The witness Rafael Cestero stated that he accompanied Mr. Valldejuli-Rodríguez the day of the hearing of the case of Dr. De Castro, from the time the hearing began until it ended; and that he left with Mr. Valldejuli-Rodríguez; that as he left with Mr. Valldejuli-Rodríguez, he saw a man hiding behind the first column of the rotunda, a hand with a pointed revolver; that he called the attention of the man and shouted to him; that Valldejuli-Rodríguez dropped the books, stepped ahead and drew his revolver and the man ran towards some lumber or scaffolding for making repairs; that deponent pickedup the books, delivered them to Valldejuli-Rodríguez, and they left together towards the Municipal Theater Building, where the municipal offices were located. That Valldejuli-Rodríguez entered the building with the object of talking to the City Manager and deponent stayed in the waiting room; that from there they left together towards Valldejuli-Rodríguez' home; that the man who pointed the revolver was a middle-aged person, white, rather good-looking and wore large eyeglasses. The impression of deponent is that if he saw the man again anywhere he would identify

him, as he saw him face to face. That deponent requested Valldejuli-Rodríguez to hand him the revolver to see if he could overtake the man, but respondent told him that the man might be hiding behind one of the columns and might kill him. Cross-examined by the prosecuting attorney, deponent testified that he was the first one to notice what happened and that when he saw the man he shouted at him "you criminal." That the said individual was pointing at the place where Valldejuli-Rodríguez was walking and that respondent was one or two steps ahead of witness; that when Valldejuli-Rodríguez dropped the books and drew the revolver, deponent attempted to step ahead towards the man, who was protected by the column, but the man ran swiftly to the interior of the building while putting his revolver in the inside pocket of his coat; that he does not know where the man went to, because there were many beams and it was dark and he could not see whether the man went out of the building or not; that since that happened he has not seen the individual again and that the man was of middle height, that is of the ordinary height of Puerto Ricans. Describing the man, witness said: "A rather short individual and very good-looking; and although I am not trying to identify the man, as I heard Mr. Hernán Franco's testimony, his description agrees with that of the man I saw"; that his eyes were light-colored, just as described by the district attorney; somewhat of a caramel color. That he could notice that the eyes of the man were of that color, in spite of the fact that the man wore dark glasses, because the first thing the man did was to take off his glasses; that the man did not remain there long because to take off one's glasses does not take long.

Respondent testified in his own behalf and, after relating the incident between him and Mr. Enrique Castro Martínez, went on to state: That District Attorney Franco called him to his office and told him to be careful because the brother

of the deceased Irizarry made him responsible for the death of his brother; that the sole intervention he had in the case of Irizarry was to take his brother's family to the country. That all that happened before the hearing of the case of Dr. De Castro against the Board of Commissioners; that deponent was greatly excited, feared for his safety, and was of course ready to defend himself; that when the hearing of Dr. De Castro's case was over, he remained intentionally in the courtroom waiting for everyone to leave, because his head was full of premonitions, due to what he had heard from District Attorney Franco and "also because there are persons who act not according to their free will but according to the will of others"; that 15 or 20 minutes later he went out and he solemnly affirms that as he went down the corridor next to the secretary's office there was no one in the hallway nor on the bench; that he went out accompanied by Mr. Cestero, he does not remember whether Cestero was ahead or behind him; that when they passed the first arcade to the left and walked towards the left arcade of the Capitol, in front of the second arcade to the left, which is the first one leading to the rotunda he heard Cestero shout "you criminal." That then "my books fell down or some of them and automatically, possibly through reflex action, I think I drew my revolver in order to defend myself, and as I looked this way I saw an arm with a shiny object, something like a revolver, pointing at me." That the person had amber-colored glasses, wore a light suit, and was a man who gave the impression of being of middle height; that after his agitation subsided, as he began to walk out again, he saw an employee of the Capitol coming out of the rotunda but that was when they renewed their step; that when they came out and descended the outer stairs in front of Ponce de León Avenue there was no one on said stairs; that the only person who appeared later was the Capitol watchman; that the man who pointed at him ran towards the north side of the building

where there is a frame scaffold; that after he left the building he went to the mayor's office to complain of having been left alone and of having had no one to help him in a case like that; that in the morning he went to see Dr. De Castro's attorneys to request them to investigate for it seemed to him that it was very possible that some follower of Dr. De Castro might be interested in harming him, without Dr. De Castro knowing it. That he requested attorney De la Haba to talk to Dr. De Castro, to tell him that was of no importance any longer; that respondent was very fond of him and that all he did was to discharge his duty; that respondent came to the court not with the object of filing a complaint or of influencing the mind of the court, but rather to have an exchange of views and perhaps to obtain some support for his position; that when he arrived he spoke with the secretary and the marshal, who informed him that they had seen strange happenings in the courtroom, for there was an individual who once in a while laughed with Dr. De Castro and his wife. On hearing those words his spiritual unrest increased; that the marshal asked him if he had a friend among the Justices of the Supreme Court and he replied that all of them were his friends and the marshal invited him to see Mr. Justice De Jesús; that he told everything to Justice De Jesús and when the latter asked him if witness wanted him to transmit to the court everything witness had told him, respondent replied "As you wish" and the Justice thought that was respondent's intention; that he solemnly swears that he never thought of influencing the mind of the court in its decision of the case of Dr. De Castro; that some months after those facts, on November 20, 1940, at 1:30 p. m., while deponent was at a restaurant known as "Estrella de Italia," he saw there Senator Felipe Colón Díaz and went to his table to greet him; that immediately a man who was at the table got up violently and told him: "Your brother and your nephew are two criminals; I ought to murder you right now." That happened immedi-

ately after deponent had been asked if he knew Mr. Irizarry; that deponent then realized the situation, stepped back towards a small window, stood near the wall, drew his gun, and answered: "Go ahead and see how you come out"; that Senator Colón Díaz then intervened;. that besides Senator Colón Díaz, the incident was witnessed by the Mayor of Vega Alta and by an employee of the "Estrella de Italia."

The evidence, taken as a whole, is in our opinion amply sufficient to justify the averments of the complaint. Witnesses Avilés and Christian who were present at the time and place of the alleged assault and were in a position to notice the facts, had they occurred, emphatically testified that nothing happened then and there to call their attention and that on the contrary they saw Mr. Valldejuli and his companion, Mr. Cestero, descend the stairs of the hallway of the secretary's office, cross the vestibule and go out to the street through the doors of the southern facade of the Capitol, which lead to Ponce de León Avenue, and that nothing unanticipated happened to them, and that they walked and talked in perfect peace and quiet. The court gives full credit to the testimony of these witnesses whose presence at the place where respondent alleges the assault occurred, has been established beyond all doubt by the testimony of Marshal Látimer and of Attorney Rivera Zayas.

The court has been strongly impressed by the fact that,. although respondent had told all the persons to whom he reported the alleged assault, that a friend of his told respondent that prior to the trial of the case said friend saw the man who had pointed a revolver at respondent, at a café at Stop 15, in Santurce, drinking with Dr. De Castro and his wife, and although he had stated under oath in the preliminary investigation made by order of this court, that when he was informing the City Manager of what happened at the Capitol Building "I was informed there by *a person I can identify,* that prior to the trial of the case before this Hon.

Supreme Court, said person had seen a man wearing a light suit and amber-colored glasses, similar to that described by me, at Stop 15, drinking with Dr. De Castro'', when he testified before this court entirely refrained from referring to a fact so essential to his defense and made not the least effort to bring to the presence of the court his informant, whom he said he could identify, to repeat before the court the report that respondent utilized in order to connect not only Dr. De Castro but also his wife, with the commission of the alleged assault against him. The suppression of such evidence warrants us in assuming either that the same does not exist or that if it had been introduced it would have been adverse to respondent.

The evidence offered by respondent, in a belated effort to withdraw his false accusation against Dr. and Mrs. De Castro and to direct the same against the brother of the deceased Irizarry, is unworthy of any credit, for according to the testimony of Avilés and Christian, to which we have accorded credit, it is not true that respondent was assaulted with a revolver by any person.

The testimony of the witness Cestero deserves no credit at all. When this witness was invited on January 23, 1940, by Marshal Látimer to show him the exact place where he saw the man with the revolver hiding, he showed to the marshal the second column to the left of the hallway, after descending the stairs close to the marshal's office, and subsequently, on the same day, he called the marshal, rectified the first report given, and stated that the place of the occurrence was near the fourth column, in front of the stairways at the exit of the Capitol, saying: ''Mr. Látimer, I made a mistake this afternoon when I showed you where the facts had occurred; the case happened here,'' pointing to a column next to the outer doors of the Capitol. Moreover, his manner of testifying and the readiness with which he availed himself of the description that Attorney Franco had made of Mr. Iri-

zarry, by accepting the same as the exact description of the man who had assaulted Mr. Valldejuli-Rodríguez, without taking into consideration that in the prior descriptions he had made of said person he had only stated that it was a white man, who wore a Palm-Beach suit and amber colored glasses, larger than those known as *"gringolas"* that fully covered the eyes, and the improbability of his testimony to the effect that the man of the eyeglasses—who undoubtedly put them on to avoid his being identified—took them off immediately after the assault, in the presence of Cestero, thus enabling the latter to testify as to the exact color of his eyes, are circumstances that lead us to the conclusion that his testimony is unworthy of credit.

Let us examine the questions raised by respondent in his brief.

Our attention has been called to the evident variance between the averment of the complaint, that Attorney Valldejuli *requested* Mr. Justice De Jesús to transmit his statements to the court and the evidence, which only shows that respondent "authorized said Justice to do so, when respondent said 'as you wish'." The variance is in our opinion of no importance. A Justice of the Supreme Court, upon being informed by an attorney that the latter had been assaulted near the courtroom, after the close of the hearing of a case and by reason of and in connection with the same, is bound to convey such information to the court in order that the latter may discharge its duty to give due protection to the assaulted attorney and enforce respect for its own dignity by punishing the aggressor. No request or authorization from the attorney is necessary in order that the court may take cognizance of the occurrence. In the instant case, the attorney, from the moment he authorized the Justice to whom he applied for protection, to transmit his report to the court, placed himself under the jurisdiction of the court, and was subject to punishment as for contempt of court if from

the investigation which must necessarily be made it should turn out that the facts denounced by him were false.

■ The respondent urges that, in the complaint, it is charged against him that the statements made by him to Mr. Justice De Jesús were false, and that they were made with the "specific intent" to unduly influence the Supreme Court against Dr. De Castro; and that said specific intent has not been proved "as an independent and distinct element in the commission of the crime."

What the complaint charges is that the respondent, in making the report of the alleged assault, "did so unlawfully and voluntarily, and knowing that said facts were false and that he was stating them with the object of tending to unduly influence the Justices against Dr. De Castro.

It is true that when a specific intent is an essential element of a particular crime, such specific intent must be proved in order that a conviction may be upheld. Hence in the case of *People* v. *Pérez,* 48 P.R.R. 704, cited by respondent, where the defendant was convicted of the crime of burglary in the first degree, committed as alleged in the information, by entering into a house at night with the intent to commit the crime of rape, the judgment was reversed because the facts shown tended to deny rather than to establish the intent to commit a rape, and in the absence of such intent the crime of burglary consequently did not exist. The evidence showed that Pérez entered the house to meet his sweetheart, who had agreed to abandon the house and elope with him. The specific intent to commit the crime of rape could not be inferred from those facts. Had the evidence shown that Pérez had raped his sweetheart or had assaulted her with such intent, the judgment of the lower court would undoubtedly have been affirmed, for the act carried out would have been enough in order that the intention with which the defendant had entered the house could be inferred. The only way of proving malice, which is the intent to do injury to

another, is by inferring it from the circumstances of the case. The means of proof is not demonstration but inference. See Wharton, Criminal Evidence, sec. 7, 735–9, and Wharton, Criminal Law, sec. 113 and cases cited in note 2.

■■ It having been proved beyond a reasonable doubt that the facts stated by respondent to Mr. Justice De Jesús and transmitted by the latter to the court, were false, and that respondent had knowledge of their falsity, we must reach the conclusion that the object respondent had in making such a false report was to carry to the minds of the Judges the idea that Dr. De Castro and his wife were persons capable of entering into a conspiracy with a criminal and of inducing the latter to attempt against the life of respondent, by the mere fact that respondent had represented the opposite party in the case pending before this court. Respondent's purpose could not have been, as claimed, to ask for protection and security for his person, for the evidence has shown that absolutely nothing happened to him. The facts and circumstances of the case lead us to the inevitable conclusion that the object that respondent aimed to reach with his contemptuous and disrespectful conduct was to influence the court against Dr. De Castro. Respondent was not interested in the investigation of the alleged assault. What he was interested in was in dropping poison upon the minds of the Judges, in the hope that the effect thereof would be prejudicial to his opponent.

Attorneys, as officers of the courts of justice, are bound more than all other citizens to show the courts and their judges all due respect and consideration. The aim of the courts and of the attorneys is only one: to know the truth. An attorney who, instead of aiding in the determination of the facts, seeks to cloud them, and resorts to deceitful practices in order to mislead the court and induce it to do an injustice, is guilty of contemptuous and insolent conduct, and hence is also guilty of contempt.

Therefore, Juan Valldejuli-Rodríguez is adjudged guilty of contempt of court and sentenced to fifteen days' imprisonment in the District Jail of San Juan, located in this City of San Juan, and to pay a fine of $50 and the costs.